# CILENTI & COOPER, PLLC

ATTORNEYS AT LAW
10 Grand Central
155 East 44th Street – 6th Floor
New York, New York 10017

Telephone (212) 209-3933
Facsimile (212) 209-7102

March 9, 2021

**BY ECF**

Hon. Kenneth M. Karas, U.S.D.J
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

      **Re:**    ***Perez, et al. v. Ultra Shine Car Wash, Inc., et al.***
               **Case No. 20-CV-782 (KMK) (LMS)**

Dear Judge Karas,

      We are counsel to the plaintiffs in the above-referenced matter, and jointly submit this letter with counsel for the defendants for the Court's assessment and approval of the settlement agreement ("Agreement") reached between the parties. The Agreement is being submitted contemporaneously herewith, and the parties respectfully request that the Court approve the Agreement because it represents a fair resolution of this matter, negotiated at arm's length between experienced counsel.

### I.    *The Need for the Court's Approval of the Agreement*

      As plaintiffs' action arises under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), the parties' settlement must be approved by this Court. *See Cheeks v. Freeport Pancake House, Inc.*, 796 F. 3d 199 (2d Cir. 2015). The FLSA expressly prohibits settlement of any right to unpaid minimum wages or overtime claims by employees made pursuant to 29 U.S.C. §§ 206-07, without the supervision of the Secretary of Labor. *See* 29 U.S.C. §216(c) (noting that a supervised settlement agreement "shall constitute a waiver by such employee of any right he may have [to pursue a private cause of action under FLSA"]). Courts have allowed an additional exception to the FLSA's restriction on settlement to include judicially supervised stipulated settlements. *See also D.A. Schulte, Inc., v. Gangi*, 328 U.S. 108, 113 n.8 (1946); *Lynn's Food Stores, Inc. v. United States ex. Rel. U.S. Dept. of Labor*, 679 F.2d 1350 (11th Cir. 1982); *see also Sampaio v. Boulder Rock Creek Developers, Inc.*, No. 07 Civ. 153, 2007 U.S. Dist. LEXIS 66013 (E.D.N.Y. Sept. 6, 2007).

Hon. Kenneth M. Karas, U.S.D.J.
March 9, 2021
Page 2

## II.     The Parties

### a.     *Defendants*

Defendant, Ultra Shine Car Wash, Inc., owned and operated a car wash doing business as "Ultra Shine Car Wash," in Yonkers, New York. Defendant, Adelino F. Pastilha, is the President and Chief Executive Officer of the corporation and, together with co-defendant Juan Mendez, managed and ran the day-to-day operation of the car wash. The business normally operated seven (7) days per week, from 8:00 a.m. until 7:00 p.m. (6:00 p.m. on Sunday) in the summer, and from 8:00 a.m. until 6:00 p.m. (5:00 p.m. on Sunday) in the winter.

### b.     *The Plaintiffs*

Plaintiffs are former employees of the defendants' car wash, who worked as car wash attendants cleaning and detailing customer vehicles. The following is alleged with respect to each plaintiff:

- Jose Luis Perez

Plaintiff, Jose Luis Perez, alleges that he was hired by the defendants in or about 2010, and remained employed through in or about September 2019.[1] A factual dispute exists as to the continuity of Mr. Perez's employment during the relevant six (6) year limitations period. According to the defendants, Mr. Perez did not work for the car wash for approximately eight (8) months in 2014, and approximately four (4) months in 2016. Plaintiff disputes this contention, but acknowledges not working for approximately two (2) weeks sometime in or about 2016.

Although his work shift fluctuated slightly week to week, plaintiff alleges that his typical work schedule consisted of six (6) days per week, with a shift of eleven (11) hours per day Monday, Tuesday, Wednesday, Friday, and Saturday from 8:00 a.m. until 7:00 p.m.; and ten (10) hours on Sunday from 8:00 a.m. until 6:00 p.m., thereby working approximately sixty-five (65) hours per week. Plaintiff was not required to punch a time clock at the start and end of each work shift.

With respect to his pay, plaintiff alleges as follows:

- January 2014 – December 2014: $70 per day[2]
- January 2015 – December 2015: $75 per day
- January 2016 – December 2016: $80 per day
- January 2017 – December 2017: $85 per day
- January 2018 – December 2018: $90 per day

---

[1] Neither at the time of hire, nor any time thereafter, did Mr. Perez receive a wage notice setting forth his regular hourly rate of pay and corresponding overtime rate of pay.
[2] The relevant six (6) year limitations period begins in January 2014.

- January 2019 – September 2019: $95 per day

Mr. Perez was paid in cash, and did not receive a wage statement upon receiving his wages each week.

- <u>Pedro Santiago Zacariaz</u>

Plaintiff, Pedro Santiago Zacariaz, alleges that he was hired by the defendants in or about January 2019, and remained employed through in or about September 2019.[3] According to plaintiff, although his work shift fluctuated slightly week to week, he typically worked six (6) days per week, and his normal work shift consisted of eleven (11) hours per day Monday, Tuesday, Wednesday, Friday, and Saturday from 8:00 a.m. until 7:00 p.m.; and ten (10) hours on Sunday from 8:00 a.m. until 6:00 p.m., thereby working approximately sixty-five (65) hours per week. Plaintiff was not required to punch a time clock at the start and end of each work shift, and alleges always being paid at the rate of $85 per day.

### III.   Defendants' Wage and Hour Records

Defendants produced wage and hour records that show the days and hours worked by plaintiffs, and the wages paid, as claimed by the defendants. According to the defendants, the plaintiffs rarely worked in excess of fifty (50) hours in a week, and often worked less than forty (40) hours per week. According to the defendants, this was due to the fact that the car wash was closed entirely or closed early due to inclement weather, holidays, maintenance, and other factors.

### IV.   Defendants Defenses/Positions

Defendants raise various defenses. First, as referenced above, defendants' records show that Plaintiff Perez did not work at defendants' car wash for 33 weeks in 2014 and for 19 weeks in 2016. Defendants' records also show that Plaintiff Zacariaz's employment start date was April 29, 2019, not January 2019, as alleged by plaintiff. Second, defendants dispute the number of hours that plaintiffs claim to have worked. According to the defendants, the maximum possible work hours were 56 hours in the winter, and 62 hours in the summer, based on the car wash's opening and closing times and excluding 30-minute lunch breaks. However, according to defendants, plaintiffs rarely worked close to the maximum possible work hours because of the days and hours when the car wash was closed due to inclement weather and maintenance, and the days when plaintiffs left early for other reasons. Third, as discussed below, defendants assert that plaintiffs' damages should be calculated using the fluctuating workweek method of computing overtime in 29 C.F.R. § 778.114.

---

[3] Neither at the time of hire, nor any time thereafter, did Mr. Zacariaz receive a wage notice setting forth his regular hourly rate of pay and corresponding overtime rate of pay.

Hon. Kenneth M. Karas, U.S.D.J.
March 9, 2021
Page 4

### V.     Plaintiff's Calculated Damages

Plaintiffs calculated that they are owed approximately $180,000 in unpaid minimum wages, overtime compensation, and "spread of hours" premium, with an equal amount in liquidated damages.[4]

Meanwhile, the defendants maintain that the plaintiffs' recovery, if any at all, would be de minimis amounting to a total of about $10,000 (not including liquidated damages).

A dispute exists between the parties as to whether plaintiffs' damages should be calculated on a fluctuating workweek (better known as "half-time") analysis. According to the defendants, that is the proper method of calculating plaintiffs' alleged damages because of the fact that plaintiffs' work hours fluctuated each week. Meanwhile, plaintiffs do not believe that is the proper method of calculating plaintiffs' damages for a number of reasons, but most importantly because they did not receive the same amount of gross pay each week regardless of the fact that their work hours fluctuated higher and lower each week, which is a mandatory feature of that methodology of calculation.

### VI.    Settlement Amount

As reflected in the attached Agreement, the parties have agreed to settle the case for a total of $65,000 to resolve all of plaintiffs' wage and hour claims against the defendants.

### VII.   The Agreement is Fair and Reasonable

We believe this settlement to be a fair resolution to this litigation, due to *bona fide* disputes about plaintiff's claims.

An FLSA settlement should receive judicial approval where it is "fair and reasonable." *See Wolinsky v. Scholastic, Inc.*, 900 F. Supp.2d 332, 335 (S.D.N.Y. 2012). In considering whether a settlement is fair and reasonable, the principal question is "whether the agreement reflects a reasonable compromise of disputed issues rather than a mere waiver of statutory rights brought about by an employer's overreaching." *Le v. SITA Info. Networking Computing USA, Inc.*, No. 07 Civ. 86, 2008 U.S. Dist. LEXIS 20786, at *2 (E.D.N.Y. Mar. 13, 2008) (*quoting Lynn's Food Stores, supra*, 679 F.2d at 1354)); *see also In re Penthouse Executive Club Compensation Litig.*, No. 10 Civ. 1145, 2014 U.S. Dist. LEXIS 5864, at *22 (S.D.N.Y. Jan. 14, 2014) (noting that inherent adversarial nature of a litigated FLSA case is an adequate indicator of fairness of settlement).

---

[4] Even giving the defendants the benefit of the doubt regarding plaintiffs' work hours and periods of employment as set forth in their records, plaintiffs estimate that their underlying minimum wage and overtime compensation deficiency amounts to approximately $24,000 (not including "spread of hours" or attorneys' fees), and together with liquidated and statutory damages, their total damages would approximate to $68,000.

Hon. Kenneth M. Karas, U.S.D.J.
March 9, 2021
Page 5

Here, it is undisputed that this settlement did not result because of "overreaching" by the employer. To the contrary, the settlement was reached as a result of extensive arm's length negotiations between counsel who are well versed in the prosecution and defense of wage and hour actions, and with the help of mediator Evan J. Spelfogel, Esq. Courts typically regard the adversarial nature of a litigated FLSA case to be an indicator of the fairness of the settlement. *See Aponte v. Comprehensive Health Management, Inc.*, No. 10 Civ. 4825, 2013 U.S. Dist. LEXIS 47637 at *9 (S.D.N.Y. Apr. 13, 2013).

In light of the various disputes discussed above, this settlement should be approved. By settling now, plaintiffs receive a significant portion of their calculated unpaid wages even after attorneys' fees are accounted for, while enabling the parties to avoid the risks inherent in any trial.

### VIII. Application for Attorneys' Fees

Pursuant to this firm's retainer agreement with plaintiff, our firm will retain one-third the net proceeds of the settlement after deduction of the firm's costs (filing fee and service). Therefore, plaintiff's counsel seeks $22,000 in fees and costs, which is approximate with the firm's lodestar.

Attorneys' fees in FLSA settlements are examined to ensure that the interests of plaintiff's counsel in his own compensation did not adversely affect the extent of the relief counsel procured for the clients. *See Wolinsky v. Scholastic*, 900 F. Supp. 2d 332, 336 (S.D.N.Y. 2012). In this case, plaintiff's counsel fee of one-third is reasonable. Of course, had the case proceeded, assuming plaintiff prevailed, plaintiff's counsel would have made a fee application for much more than the amount currently sought in fees.

While the Second Circuit's ruling in *Cheeks* did not outline the factors for approving a settlement, certain red-flag issues were identified, such as the inclusion of confidentiality provisions, general releases, and attorneys' contingency fees in excess of 40%. *Id.* at 206. This Agreement contains no such red flags. Moreover, since the *Cheeks* decision, many courts have recognized the "percentage of the fund" method as an appropriate means by which to compensation plaintiff's attorneys in FLSA settlements. *See Velasquez v. Digital Page*, No. 11 Civ. 3892, 2016 U.S. Dist. LEXIS 84554, at *4 (E.D.N.Y. June 28, 2016) (applying one-third of percentage of fund method in approving settlement); *see also Hiang v. Chiang*, No. 16 Civ. 1129, 2016 U.S. Dist. LEXIS 142670, at *7-8 (S.D.N.Y. Oct. 14, 2016) (awarding attorneys' fees of one-third of settlement amount in FLSA case); *Chauca v. Abitino's Pizza 49th St. Corp.*, No. 15 Civ. 6278, 2016 U.S. Dist. LEXIS 86206, at *6 (S.D.N.Y. June 29, 2016) (awarding attorneys' fees in amount of one-third of gross settlement); *Meza v. 317 Amsterdam Corp.*, No. 14 Civ. 9007, 2015 WL 9161791, at *2 (S.D.N.Y. Dec. 14, 2015) (when using the "percentage of the fund" approach, "courts regularly approve attorneys' fees of one-third of the settlement amount in FLSA cases"); *Rangel v. 639 Grand St. Meat & Produce Corp.*, No. 13 Civ. 3234, 2013 U.S. Dist. LEXIS 134207 (E.D.N.Y. Sept. 19, 2013) (approving attorneys' fees of one-third of the FLSA settlement amount); *Febus v. Guardian First Funding Group, LLC*, 870

Hon. Kenneth M. Karas, U.S.D.J.
March 9, 2021
Page 6

F. Supp. 2d 337, 340-41 (S.D.N.Y. 2012) ("a fee that is one-third of the fund is typical" in FLSA cases).

For all of the reasons set forth above, the parties request that the Court approve the Agreement and enter the proposed Stipulation and Order of Dismissal that is being submitted simultaneously herewith, which expressly provides that the Court will retain jurisdiction over this matter solely for purposes of enforcing the Agreement.

We thank the Court for considering this application.

Respectfully submitted,

Justin Cilenti

cc: Stanley J. Silverstone, Esq. (by ECF)